## AFFIDAVIT IN SUPPORT OF A
## SEARCH WARRANT APPLICATION UNDER RULE 41

I, Bradley Baker, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of an electronic device capable of accessing the internet (the Target Phone, defined below and described in Attachment A), and the extraction from the Target Phone of electronically stored information further described in Attachment B.  Because this affidavit is submitted for the limited purpose of securing a warrant to search the Target Phone, I have set forth only the facts which I believe are necessary to establish probable cause to search the Target Phone.

2.      I am a Special Agent (SA) and a Computer Forensic Agent (CFA) with Homeland Security Investigations (HSI) assigned to HSI Assistant Special Agent in Charge (ASAC) Nogales, Arizona. As such, I am an investigative law enforcement officer of the United States within the meeting of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I have been a Special Agent with HSI since July 2018.  As a Special Agent, I am responsible for investigating laws enumerated in Title 8, Title 18, and Title 21 of the United States Code. Included in my responsibilities is the investigation of illicit contra-band smuggling, including controlled substance smuggling, across the United States border.  In preparing to become a Special Agent, I attended the Criminal Investigator Training Program and the HSI Special Agent Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I have a Bachelor of Science degree in Criminal Justice from Appalachian State University.   As an HSI Special Agent I have conducted numerous investigations involving drug smuggling into the U.S.

3.      Prior to joining HSI, I was a Special Agent with North Carolina State Bureau of Investigation Alcohol Law Enforcement Branch for more than eight years in Asheville, North Carolina. During that time, I conducted numerous criminal investigations involving violations of criminal laws resulting in arrests. During these investigations I applied for and executed numerous

search warrants that resulted in successful prosecutions. I was also a Federal Task Force Officer with HSI for two years. During that time, I became familiar and assisted with the enforcement of federal laws.

    4.      Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and organizational structure of drug smugglers and drug trafficking distribution networks. My responsibilities include conducting investigations into drug smuggling organizations and individuals who derive substantial income form the illegal importation, manufacture, distribution, and sale of illegal controlled substances. As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law to include the enforcement of federal drug laws, money laundering laws, and various customs and immigration laws.

    5.      Through training and experience I know:

        a.      That large-scale drug traffickers often utilize electronic equipment such as cellular telephones, personal digital assistants (PDAs), computers, telex machines, facsimile machines, and telephone answering machines to generate, transfer, count, record, and/or store information related to the transportation, ordering, selling, and distribution of controlled substances;

        b.      That drug traffickers commonly use cellular telephones to communicate with their narcotics associates and to facilitate the commission of their narcotics offenses. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of narcotics associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the drug-trafficking associates and/or activity, all of which can be used to identify and locate narcotics-trafficking associates, to identify methods of operation of the drug-trafficking organization (DTO), and to corroborate other evidence obtained during the course of the current investigation;

    c. That drug traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephones, and PDAs which reflect names, addresses, and/or telephone numbers of their associates in the smuggling organization;

    d. That drug traffickers commonly utilize electronic paging devices, cellular telephones, radio telephones, and telephone scrambling devices in attempts to maintain secure communications between drug suppliers and customers; and

    e. That drug traffickers take, or cause to be taken, photographs and videos of themselves, their associates, their property, and their drugs. That these drug dealers usually maintain these photographs within their possession and in their cellular telephones.

    f. That drug traffickers retain records pertaining to financial transactions and the persons for whom the transactions are being conducted.

    g. That drug traffickers collect data pertaining to other co-conspirators involved in drug-trafficking activity, including drug types and quantities provided, as well as monies owed and/or paid for illegal controlled substances;

    h. That drug traffickers possess and maintain records reflecting bank transactions and/or money transfers.

### IDENTIFICATION OF THE PROPERTY TO BE EXAMINED

6. The property to be searched is an Apple iPhone cellular smartphone (Target Phone). The iPhone is in a clear plastic case that has silver stars on the back.

7. The Target Phone is currently in storage and secured in the evidence vault, located at the HSI Nogales Office in Nogales, Arizona and is labeled as Line Item: 0004. The applied-for warrant would authorize the forensic examination of the Target Phone for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

8. On December 21, 2022, at approximately 9:58 p.m., United States (U.S.) Customs and Border Protection Officer (CBPO) Jordan Lincoln was working primary vehicle inspection lane four at the DeConcini Port of Entry in Nogales, Arizona. CBPO Lincoln encountered a 2012 Kia Soul bearing Arizona registration plate of H2A82L. The vehicle was driven by the registered

owner Stephanie Marie RAMIREZ-Seibert, a U.S. Citizen, who presented herself for entry into the U.S. from the Republic of Mexico. The vehicle was also occupied by RAMIREZ's five-year-old child and infant.

9. RAMIREZ informed CBPO Lincoln she had traveled from Nogales, Arizona to Mexico for the day to shop and visit family. RAMIREZ stated she had been in Mexico for a couple of hours. CBPO Lincoln observed RAMIREZ stuttering her speech when she answered questions. RAMIREZ said she did not have any identification documents for her infant child. CBPO Lincoln referred RAMIREZ to secondary inspection.

10. During secondary inspection, RAMIREZ was instructed to drive the Kia through the Z-Portal (x-ray) machine. CBPO Joseph Sokolowski, a certified Z-Portal operator, scanned the vehicle and identified anomalies in spare tire wheel well area of the vehicle. CBPO Sokolowski utilized the Z-Portal database to compare previous scans of similar 2012 Kia Souls and verified the anomalies.

11. Secondary CBPO Morris Cohen contacted RAMIREZ and obtained a negative binding customs declaration to include narcotics and any other illegal substances. RAMIREZ informed CBPO Cohen she was traveling to her home in Nogales, Arizona from Nogales, Sonora. RAMIREZ stated she went to Mexico to see her grandmother and make tamales. RAMIREZ also advised CBPO Cohen that her cousin drove the Kia to go get firewood for the tamales while she was in Mexico. RAMIREZ said she owns the vehicle and is responsible for everything inside. CBPO Cohen escorted RAMIREZ to the waiting area and was then notified that the Z-Portal scan revealed anomalies in the spare tire area.

12. CBP Canine Enforcement Officer (CEO) Marcus Johnson utilized his assigned narcotic detection canine, Bear (220443) to conduct a sniff of the Kia. CBP Canine Bear alerted to a trained odor emanating from the cargo area where the spare tire is located and the rear seats of the vehicle. Upon further inspection of the vehicle, CBPOs discovered twenty packages containing blue pills concealed in the spare tire wheel well. The spare tire wheel well is accessed from inside the vehicle underneath a cover in the rear cargo area. The packages were laying where

the spare tire was supposed to be. No spare tire was located. The packages were wrapped in brown tape labeled "VIO" and "Triple JR".

13. CBPO Cohen took a representative sample from the contents of the packages and conducted a field test. The sample tested positive for the characteristics of fentanyl utilizing the Rapid Response test kit. The twenty packages weighed a total of 26.14 kilograms.

14. The current estimated street value of the 26.14 kilograms of fentanyl in this area ranges between $640,430 and $764,595 ($24,500 - $29,250 per kilogram). Based on my training and experience of previous drug smuggling investigations, drug trafficking organizations do not typically provide contraband valued as high as this to unknowing couriers.

15. At approximately 12:13 a.m., RAMIREZ read her Miranda Rights out loud from ICE Form 73-25 (Spanish). RAMIREZ acknowledged that she understood her rights and initialed next to each line of the form. RAMIREZ waived her rights and agreed to speak to me without an attorney present. RAMIREZ told me she has owned the Kia for approximately three months and had purchased it from her aunt.

16. RAMIREZ informed me, earlier that day she had gone to work in Rio Rico, Arizona from 8:00 a.m. to 2:00 p.m. before picking up her kids at the babysitter and returning to her house in Nogales, Arizona. RAMIREZ said at approximately 6:00 p.m., she crossed into Mexico to go to her grandmother's house to make tamales.

17. RAMIREZ stated, while she was at her grandmother's house, her cousin, "Valentin Trejo", took her Kia for approximately five to ten minutes to get firewood for the tamales. RAMIREZ told me that Trejo did return with firewood. RAMIREZ said no one else has used her car other than Trejo. RAMIREZ later described Trejo as her brother who was raised by her aunt. RAMIREZ also recalled Trejo asking her what time she worked tomorrow (December 22, 2022) while she was at her grandmother's house. RAMIREZ informed me she left her grandmother's house at approximately 9:00 p.m. to return to her house in Nogales, Arizona.

18. RAMIREZ denied knowing there were drugs inside her vehicle and said the only person who could have put them in there was Trejo. RAMIREZ told me she did not believe her

cousin, Trejo, would put drugs in her vehicle. RAMIREZ said Trejo lives in Nogales, Sonora with her aunt.

19. I showed the Target Phone to RAMIREZ, and she confirmed it was her phone. RAMIREZ refused to give me consent to search her phone. When asked if there was anything in her phone that would tell a different story, RAMIREZ stated no. RAMIREZ initially agreed to call her cousin in my presence. SA Baker put the phone in front of her and she tried to unlock the iPhone using face ID but was being prompted to enter a four-digit pin code. RAMIREZ refused to enter the pin code in my presence.

20. Later, RAMIREZ informed me that Trejo had also used her Kia the day prior (December 20, 2022). RAMIREZ said at approximately 7:00 p.m., he called her and said he was at the Shell gas station by Mariposa Port of Entry with two "random individuals". RAMIREZ stated she allowed Trejo to borrow the vehicle to go to Walmart. RAMIREZ told me that Trejo returned the car to her apartment around 10:00 p.m. and left the keys in it. RAMIREZ said she communicates with Trejo through WhatsApp, and he is listed as a contact in her phone as "Valentin Hermano".

21. I accepted custody of the Target Phone and observed the phone was in Airplane mode. When Airplane mode is enabled on an iPhone, it turns off all radios, which can include Wi-Fi and Bluetooth depending on the user's settings. This disables the devices' ability to send and receive wireless data. It is a common practice for CBPOs to place cell phones they seize from drug smuggling events into Airplane mode to prevent the phone from being remotely erased. On the lock screen of the phone, I observed two missed phone call notifications from different contacts. These phone calls would have occurred before the iPhone was placed in Airplane mode. Any alerts for communications to this device after the iPhone was place in Airplane mode would not have appeared on the lock screen. In my training and experience, cell phones are utilized to coordinate transportation of drugs by drug trafficking organizations. Based on training and experience, I am aware that drug couriers and coordinators routinely communicate via cellular telephone, including through SMS/text messages and messaging applications, prior to and immediately after entering the United States with drug-laden vehicles.

22. Based on the above information, there is probable cause to believe that RAMIREZ was involved in conspiring to import and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, 841, and 952, and other federal drug statutes, and that evidence related to this offense is located on the Target Phone.

23. The Target Phone is currently in storage and secured in the evidence vault, located at the HSI Nogales Office in Nogales, Arizona. In my training and experience, I know that the Target Phone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when they first came into the possession of HSI.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. <u>Digital camera</u>: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate

Case 4:23-mb-04200-MSA   Document 1-1   Filed 01/04/23   Page 8 of 13
23-04200MB

reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c. <u>Portable media player</u>: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d. <u>GPS</u>: A GPS navigation device uses the Global Positioning System (GPS) to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. <u>PDA</u>: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving

them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

    f. <u>Tablet</u>: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

    g. <u>Pager</u>: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

    h. <u>IP Address</u>: An Internet Protocol (IP) address is a unique numeric address used by computers, including cell phones, on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i. <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  25. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that

the Target Phone has capabilities that allows it to serve as a wireless telephone, receive and send email, instant messaging, and a digital camera.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

27. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Phone was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on the Target Phone:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Phone consistent with the warrant. The examination may require authorities to employ techniques that might expose many parts of the Target Phone to human inspection in order to determine whether it is evidence described by the warrant.

29. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.

## CONCLUSION

30. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Phone as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

BRADLEY D BAKER
Digitally signed by BRADLEY D BAKER
Date: 2023.01.04 13:03:48 -07'00'

Bradley Baker, Special Agent
Homeland Security Investigations

Subscribed and Sworn to telephonically this __4th__ day of January, 2023.

_Maria S. Aguilera_
Honorable Maria S. Aguilera
United States Magistrate Judge

11

23-04200MB

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The property to be searched, an Apple iPhone cellular phone (Target Phone). The iPhone is in a clear plastic case that has silver stars on the back. Target Phone is currently in storage and secured in the evidence vault at the HSI Nogales Office in Nogales, Arizona.

FP&F Seizure Number: 2023260400023601

Line Item: 0004




Target Phone Front         Target Phone Back

## ATTACHMENT B
## DESCRIPTION OF ITEMS TO BE SEARCHED FOR

1. Data and/or digital files stored on or accessed through the Target Phone relating to drug trafficking, wherever it may be stored or found, specifically including:
   a. lists of customers and related identifying information;
   b. types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;
   c. types and amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered, as well as dates, places, exchange rates, and amounts of specific transactions;
   d. any information related to sources of money or narcotic drugs (including names, addresses, phone numbers, or any other identifying information).

2. Electronic correspondence stored on or accessed through the Target Phone relating to drug-trafficking, to include emails and attached files, text messages, and instant messaging logs.

3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Phone.

4. Contact lists stored on or accessed through the Target Phone, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5. Evidence of persons who used, owned, or controlled the Target Phone.

6. Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Phone.